

FILED
September 20, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
By:     MR
                  Deputy

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Case No: SA:23-CR-00499-OLG

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>UCHENNAYA OGBA (1)<br>AARON SAMS (2)<br>BEVERLY SMITH (3)<br>JESUS RODRIGUEZ (4)<br>KRISTIN HARRISON (5)<br>JONATHAN ADAMS (6)<br>BARBARA SANDERS (7)<br><br>Defendants | **SEALED<br>INDICTMENT**<br><br>COUNT 1: Conspiracy to Commit Wire Fraud, 18 U.S.C §§ 1349, 1343<br><br>COUNT 2: Conspiracy- 18 U.S.C § 371 |

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

**BACKGROUND – THE SMALL BUSINESS ADMINISTRATION AND THE HUBZONE PROGRAM**

1. The Small Business Administration (SBA) is a federal agency that aids, counsels, and assists small businesses by providing access to capital (loans), entrepreneurial development, and government contracting opportunities. SBA works with other Federal departments and agencies to award at least 23 percent of all prime government contracts to small businesses. Specific statutory goals include awarding contracts for particular types of small businesses, including those that are located in historically underutilized business zones (HUBZone). The purpose of the HUBZone program is to provide federal contracting assistance for qualified small businesses located in historically underutilized business zones in an effort to increase employment opportunities, investment, and economic development in such areas. Toward that end, the

1

HUBZone program gives preferences in government contracting to businesses that qualify as a HUBZone small business concern. Government agencies can designate a contract as a HUBZone set-aside, which restricts competition for the contract to only those businesses that are HUBZone certified. SBA also has the authority to certify and decertify a business as a qualified HUBZone business.

2.      To qualify for the HUBZone program, a business must, among other things, have its principal office located in a HUBZone and have at least 35% of its employees living in a HUBZone. SBA designates geographical areas that qualify as HUBZones.

3.      To qualify as an employee of a business for HUBZone purposes, an individual must work a minimum of 40 hours during the four-week period immediately prior to the relevant date of review of a company's HUBZone application to SBA or the date of recertification.

4.      Defendant, AARON SAMS (SAMS), owns and operates Sams Contracting Consulting and Training LLC (Sams Contracting) doing business as Sams Direct Consulting Solutions. Sams Contracting is located in San Antonio, Texas, with its principal place of business at 4063 East Houston St. San Antonio, Texas 78220. SAMS used his business, Sams Contracting, to, among other things, advertise and market a service to HUBZone companies that he and his company could provide employees that SAMS purported lived in HUBZones to these companies.

5.      Defendant BEVERLY SMITH (SMITH) is SAMS' wife. SMITH was active duty within the United States Air Force until approximately July of 2021 and was involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

6.      Defendant BARBARA SANDERS has been involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

7.  Defendant KRISTIN HARRISON is SAMS' sister. HARRISON has been involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

8.  Defendant JESUS RODRIGUEZ has been involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

9.  Defendant UCHENNAYA OGBA has been involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

10. Defendant JONATHAN ADAMS has been involved with SAMS and his business dealings at Sams Contracting related to HUBZone companies.

11. The allegations contained in Paragraphs 1 through 10 are incorporated in each and every Count of this Indictment.

**COUNT ONE**
**CONSPIRACY TO COMMIT WIRE FRAUD**
[18 U.S.C. §§ 1349, and 1343]

12. Beginning on or about 2017, and continuing through and including March of 2023, in the Western District of Texas, and elsewhere, Defendants,

**UCHENNAYA OGBA (1)**
**AARON SAMS (2)**
**BEVERLY SMITH (3)**
**JESUS RODRIGUEZ (4)**
**KRISTIN HARRISON (5)**
**JONATHAN ADAMS (6)**
**BARBARA SANDERS (7)**

did knowingly conspire, combine, confederate, and agree with others known and unknown to the Grand Jury to devise and intend to devise a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, utilizing transmissions by wire in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1343 and 1349.

## OBJECT OF THE CONSPIRACY

13. The object of the conspiracy was to enrich the conspirators by inducing HUBZone companies to pay conspirators as though the conspirators were their employees and by having certain conspirators provide a kickback portion of their payroll received from company(ies) to SAMS and/or RODRIGUEZ. To ensure that conspirators continued to be enriched, another object of the conspiracy was to ensure that HUBZone companies that worked with conspirators would appear to, on paper, satisfy HUBZone requirements; this would allow for those companies to bid for, qualify for, and ultimately obtain particular HUBZone Government contracts. This would ensure that these HUBZone companies would continue to keep conspirators on their payroll, allowing the scheme to continue. All of the above occurred while conspirators provided false and misleading information and omitted material facts to HUBZone companies and, in turn, the SBA and/or United States Government.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

14. SAMS marketed himself and his company, Sams Contracting, as a full service Federal Government contracting consulting firm that would assist HUBZone companies with obtaining and/or maintaining the requirement that 35% of each company's employees reside in a HUBZone. Meeting this requirement would allow these HUBZone companies to compete for and attempt to obtain Government contracts reserved for HUBZone certified companies. SAMS marketed that he had more than 50 individuals that resided in a HUBZone that could be placed on each company's payroll for 40 hours a month at minimum wage in order to assist the companies in meeting HUBZone requirements. A benefit of this arrangement, per SAMS, was that each

company could employ these individuals month to month and only as needed to maintain HUBZone compliance. In exchange for their pay, each employee was to run database searches that would identify federal agencies and contacts that have contract opportunities related to the company's particular industry. Then, per SAMS, this product would be sent to the specific HUBZone companies.

15.     It was further a part of the conspiracy for co-conspirators, including but not limited to SANDERS, SMITH, and SAMS, to represent that they resided in a HUBZone when in truth and in fact, they did not.

16.     SAMS and RODRIGUEZ worked together to identify a group of close friends and family (hereinafter termed "fake employees") who would provide their personal identifying information such as their driver's license and social security card to SAMS and/or RODRIGUEZ. These fake employees knew that SAMS would send their information to companies in order for these individuals to be placed on a particular company's payroll. Generally, each fake employee had little to no contact with any company they were employed by, did not fill out their own timesheets, and performed no actual work for any company; however, they would receive weekly, bi-weekly, or monthly payroll payments from companies. Generally, each fake employee paid a kickback to SAMS and/or RODRIGUEZ of approximately 20 percent of each payroll deposit they would receive. RODRIGUEZ, in turn, would provide these kickback payments that he received from fake employees to SAMS. SAMS and/or RODRIGUEZ utilized Cash App and Quickbooks to receive kickback payments.

17.     Specific examples of kickback payments involved in this conspiracy include but are not limited to the following, as detailed in paragraphs 18 through 23:

18. On July 4, 2020, RODRIGUEZ received a $75 payment on his Cash App account from co-conspirator one (CC-1) through CC-1's Cash App account.

19. On July 3 and 4, 2020, RODRIGUEZ used his Cash App account to send two payments totaling $75 to SAMS at SAMS' Cash App account.

20. On June 10, 2022, with SANDERS' permission, SAMS ran SANDERS' debit card through Quickbooks causing a payment of $400 to be debited from SANDERS' account into the account for SAMS and/or his company.

21. On June 26, 2022, with ADAMS' permission, SAMS ran ADAMS' debit card through Quickbooks causing a payment of $65 to be debited from ADAMS' account into the account for SAMS and/or his company.

22. On July 18, 2022, with OGBA's permission, SAMS ran OGBA's debit card through Quickbooks causing a payment of $410 to be debited from OGBA's account into the account for SAMS and/or his company.

23. On July 1, 2022, HARRISON used her CashApp account to send two separate $15 payments to SAMS' Cash App account.

24. In addition to receiving and/or coordinating the receipt of these kickback payments, SAMS and RODRIGUEZ also placed themselves on the payroll of HUBZone companies as detailed in the preceding paragraph.

25. SMITH, OGBA, HARRISON, and ADAMS all provided their identifying information to SAMS for use in his HUBZone scheme, and received payroll deposits from HUBZone companies without doing any work for these companies.

26. A specific example of a payroll deposit involved in this conspiracy is as follows: on October 14, 2022, SMITH received a payroll deposit into her Bank of America account ending in #5938 of $133.91 from Silotech Group.

27. SANDERS worked closely with SAMS and RODRIGUEZ in this scheme. SANDERS' role in the scheme was to create a work product that SAMS could send the companies. SAMS also sent SANDERS usernames and passwords of other fake employees so that SANDERS could complete timesheets for these individuals. SANDERS also signed the names of the fake employees for the fake employees' timesheets at the direction of SAMS. Because the fake employees did not actually do any real work, practically, they would not input time for or sign their own timesheets.

28. SAMS and/or his co-conspirators created email addresses for the fake employees using an email address at a domain that SAMS had complete control of-- @samscct.com. Many of the fake employees knew of the existence of such an email address but would have had no control over it. When providing fake employee information to the HUBZone companies, SAMS would provide this email address he and/or his co-conspirators created for each fake employee, along with SAMS' cellular telephone number as contact information. SAMS engaged in this action to control communications between the HUBZone companies and the fake employees. To ensure that HUBZone companies could never contact any fake employees directly, SAMS and RODRIGUEZ would sanitize the fake employees' resumes by removing real phone numbers and email addresses from the resumes.

29. From about 2016-2022, the following fake employees received these amounts of wages / payroll deposits from certain HUBZone companies working with SAMS in this scheme as follows: RODRIGUEZ: almost $590,000; SAMS; about $635,000; SMITH: about $570,000;

7

OGBA: about $160,000; ADAMS: almost $105,000; HARRISON: about $135,000; and SANDERS: about $350,000. These approximate amounts reflect wages/ payroll deposits only and do not reflect the approximate 20% kickback payment that most fake employees provided SAMS.

30.     The approximate full value of obligated contracts awarded to HUBZone companies involved in SAMS' scheme totals approximately $950,000,000, with over half of that amount involving the United States Department of Defense branches, including United States Air Force, United States Army, and United States Department of the Navy.

All in violation of Title 18, United States Code, § 1349.

## COUNT TWO
### (Conspiracy)
[18 U.S.C. § 371]

31.     The Grand Jury incorporates by reference, as if fully set forth herein, each and every paragraph of this Indictment.

32.     From on or about May 2022 and continuing through and including March of 2023, in the Western District of Texas and elsewhere, the Defendants,

**UCHENNAYA OGBA (1)
AARON SAMS (2)
BEVERLY SMITH (3)
JESUS RODRIGUEZ (4)
KRISTIN HARRISON (5)
JONATHAN ADAMS (6)
BARBARA SANDERS (7)**

did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with each other and with others known and unknown to the Grand Jury, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful function of the Small Business Administration and the Federal Bureau of Investigation, both government agencies, by dishonest means;

**MANNER AND MEANS**

33.     The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

34.     It was a part of the conspiracy that SAMS, after learning that the Small Business Administration (SBA) was potentially aware of his scheme, discussed with conspirators, including RODRIGUEZ, SMITH, and SANDERS, how to conceal the true nature of the scheme and how to control information provided to the SBA.

35.     It was further a part of the conspiracy that SAMS, after learning that the SBA was potentially aware of the scheme, and after consultation with RODRIGUEZ, contacted representatives at HUBZone companies to attempt to influence information that the HUBZone companies provided to the SBA.

36.     It was further a part of the conspiracy that SAMS, after learning that the SBA was potentially aware of the scheme, and after consultation with RODRIGUEZ and SMITH, engaged in communication(s) with conspirator fake employees advising them of false and misleading information to provide to SBA.

37.     It was further a part of the conspiracy that RODRIGUEZ, after learning that the SBA was potentially aware of the scheme, and after consultation with SAMS, engaged in communication(s) with conspirator fake employees advising them of false and misleading information to provide to SBA.

38.     It was further a part of the conspiracy that OGBA, after being contacted by the SBA, provided false and misleading information to the SBA. Afterwards, OGBA communicated with SAMS, explaining that the SBA contacted him and that he was successful in providing the SBA with false and misleading information.

9

39. It was further a part of the conspiracy that HARRISON, after being contacted by the SBA, communicated with SAMS, explaining that the SBA contacted her. HARRISON and SAMS discuss the false and misleading information to provide to SBA.

40. It was further a part of the conspiracy that ADAMS, after being contacted by the SBA, provided false and misleading information to the SBA. Afterwards, ADAMS communicated with SAMS, explaining that the SBA contacted him and that he was successful in providing the SBA with false and misleading information.

41. It was further a part of the conspiracy that SAMS, after learning that SANDERS had been contacted by the Federal Bureau of Investigation, urged SANDERS to provide false and misleading information to the Federal Bureau of Investigation.

## OVERT ACTS

42. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the Western District of Texas, and elsewhere:

43. In May or June 2022, after SAMS became aware that SBA was potentially aware of his scheme, SAMS conducted an in-person meeting with fake employees to prep them about what they are supposed to say they are doing as work for the HUBZone companies.

44. On June 28, 2022, SAMS and SANDERS discussed obtaining and creating back-dated spreadsheets to provide to HUBZone companies, per their request, due to the fact that the SBA was requesting that the HUBZone companies provide examples of work being done by the fake employees.

45. On July 20, 2022, RODRIGUEZ told SAMS that as long as they still have thirty HUBZone companies continuing with the scheme, both he and RODRIGUEZ should still be making enough money.

46. On July 21, 2022, OGBA informed SAMS that he was contacted by an SBA representative.

47. On July 21, 2022, HARRISON informed SAMS that she was contacted by an SBA representative.

48. On July 21, 2022, SMITH advised SAMS that he should prep the fake employees to answer SBA questions by sending them a write up of their job description.

49. On July 21, 2022, SAMS coached HARRISON on the false and misleading information to provide the SBA in response to questions that she may receive. SAMS stated that he wanted to get their stories straight. HARRISON stated that she wanted everyone to be on the same page to keep that money flowing.

50. On July 22, 2022, ADAMS provided false and misleading information to a representative with the SBA.

51. On July 22, 2022, ADAMS informed SAMS that he was contacted by an SBA representative and affirmed that he followed SAMS' instructions on what to tell the SBA representative.

All in violation of Title 18, United States Code, § 371.

**NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE**
[*See* **Fed.R.Crim.P. 32.2**]

**I.**
**Wire Fraud Violations and Forfeiture Statutes**
**[Title 18 U.S.C. §§ 1349 and 1343, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

As a result of the foregoing criminal violations set forth in Count One, the United States of America gives notice to the Defendants of its intent to seek the forfeiture of the property described

below upon conviction pursuant to Fed. R. Crim. P. 32.2 and to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

**Title 18 U.S.C. § 981. Civil forfeiture**

**(a)(1)** The following property is subject to forfeiture to the United States:

* * *

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud is an offense constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

**Title 28 U.S.C. § 2461.**

**(c)** If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure...

## II.
## Conspiracy Violation and Forfeiture Statutes
**[Title 18 U.S.C. § 371, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461]**

As a result of the foregoing criminal violation set forth in Count Two, the United States of America gives notice to the Defendants of its intent to seek the forfeiture of the property described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

**Title 18 U.S.C. § 981. Civil forfeiture**

**(a)(1)** The following property is subject to forfeiture to the United States:

* * *

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

**Title 28 U.S.C. § 2461.**

**(c)** If a person is charged in a criminal case with a violation of an Act of Congress

for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure...

### III.
### Real Property

1. Real Property located and situated at 4063 E. Houston San Antonio, TX 78220, with all buildings, appurtenances, and improvements thereon and any and all surface and sub-surface rights, title, and interests, if any, and being more fully described as follows:

    Situated in the City of San Antonio, County of Bexar, and State of Texas:

    0.344 Acres Of Land, Out Of The Southeast Part Of The P.W. Lemons 5.165 Acre Tract, And Being Out Of The G. Nunez Survey Number 151, New City Block 10626, Situated Within The Corporate Limits Of The City-Of San Antonio, Texas; Said 0.344 Acres Of Land Being More Particularly Described As Follows:

    Beginning At The North Right Of Way Line.Of East Houston Street (50' R.O.W.) And The
    Southwest Corner Of A Called 5.999 Acre Tract Conveyed To Southwest Region Conference Described In Volume 4424, Page 0673, Deed Records Of Bexar County Texas,
    Said Iron Rod Being The Southeast Corner Of The Herein Described Tract;

    Thence: With The. North Right Of Way Line Of East Houston Street And The South Line
    Of The Herein Described Tract S 89° 44' 00" W, A Distance Of 100.00 Feet To A Metal Post Found For The Southeast Corner Of A Called 0.587 Acre Tract Conveyed To Duane L. Hoover And Said Metal Post Being The Southwest Corner Of The Herein Described
    Tract;

    Thence: With The East Line Of Said 0.587 Acre Tract And The West Line Of The Herein
    Described Tract N 00° 25' 00" W, A Distance Of 150.00 Feet To A Metal Post Found For The Northeast Corner Of Said 0.587 Acre Tract And Being On The South Line Of A Called 3.319 Acre Tract Conveyed To Bm Investments Co. Inc., Described In Volume 12670, Page 1930, Real Property Records Of Bexar County Texas, Said Metal Post Being The Northwest Corner Of The Herein Described Tract;

    Thence: With The South Line Of Said 3.319 Acre Tract And The North Line Of The Herein
    Described Tract, N 89° 44' 00" E, A Distance Of 100.00 Feet To A ½" Iron Pin

Found For The Southeast Corner Of Said 3.319 Acre Tract And Being On The West Line Of Said 5.999 Acre Tract, Said Iron Rod Being The Northeast Corner Of The Herein Described Tract;

Thence: Along The West Line Of Said 5.999 Acre Tract And The East Line Of The Herein
Described Tract, S 00° 25' 00" E, A Distance Of 150.00 Feet To The Point Of Beginning,
Containing 0.344 Acres Of Land More Or Less.

2. Real Property located and situated at 7042 Butterfield San Antonio, TX 78227, with all buildings, appurtenances, and improvements thereon and any and all surface and sub-surface rights, title, and interests, if any, and being more fully described as follows:

Situated in the City of San Antonio, County of Bexar, and State of Texas:

Lot 4, Block 44, New City Block 15388, Westwood Village, Unit 22, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 5970, Page 54, Deed and Plat Records, Bexar County, Texas.

## IV.
## Property

1. Sams King Ave, LLC (Limited Liability Company), identified by Texas Secretary of State File Number 0802913698;
2. Vendor's Lien in the amount of $90,500 against the real property located at 915 King Avenue in San Antonio, Texas, as described in public document number 20180219832 held by the Bexar County Clerk.
3. S2 Butterfield, LLC, identified by Texas Secretary of State File Number 0803249379;
4. Any and all other LLCs., corporations, business structures used or intended to be used in the commission of the criminal offenses; and
5. Any and all other property and/or accessories involved in or used in the commission of the criminal offenses.

## V.
## Money Judgment

A sum of money which represents the proceeds obtained directly or indirectly, and real or personal property involved in or traceable to the violations set forth in the Counts referenced above for which each Defendant is solely liable.

## VI.
## Substitute Assets

14

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of Defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the value of said money judgment, as substitute assets pursuant to Title 21 U.S.C § 853(p) and Fed. R. Crim. P. 32.2(e)(1).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

JAIIME ESPARZA
UNITED STATES ATTORNEY

BY: 
FOR DAPHNE NEWAZ
ASSISTANT UNITED STATES ATTORNEY